The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Eugene G. Doherty presiding. Good morning. The court is calling case number 4-24-1515, People v. Stephen Coleman. Would counsel for the appellant please state your name for the record? Good morning, Your Honor. My name is Rachel Kinstrand, Office of the State Appellate Defender, Assistant Appellate Defender on behalf of Mr. Coleman. Good morning. And for the appellee? Good morning, Your Honor. Adam Rodriguez for the People with the Office of the State's Attorney's Appellate Prosecutor. Very good. Thank you both. Ms. Kinstrand, you may proceed with your argument. Thank you, Your Honor. And may it please the court and counsel, I plan to address the first two arguments in the brief regarding the arson evidence and the historical cell site location testimony. But I'm happy to address any of the other arguments as well. Before you do that, because it might affect whether you raise that argument. The relevance of the historical cell site information is that it could put the defendant's phone at the scene of the fire? Well, the relevance of the historical cell site location data is that the way the state offered it is that it purported to suggest that the phone moved from where he was living to the western apartments. And as I attempted to point out in the brief, that's not actually what historical cell site location data does. We know the phone was found at the site of the fire. We do, but we don't know when the phone was placed there. And I think if you noted in the jury deliberations, they specifically asked for Detective Wickstan's testimony about the historical cell site location analysis that he purported to do through Cell Hawk in order to establish that the phone moved at a given period before the fire from A to B. And as I pointed out, again, it's not accurate to refer to historical cell site location data as the phone moving. It's really where the phone pinged off the tower. And a number of variables can affect that, including, you know, the weather, how many towers are in the area, what the strongest tower is, etc. All right, go ahead.  And I'll focus on the first, the scientific, overall focusing on the scientific evidence in this case. As I pointed out, cases, in this case, the witnesses, the two witnesses, Coleman's ex-girlfriend and his brother had very questionable credibility. And the state relied very heavily on its law enforcement witnesses to support its case that Mr. Coleman committed arson. But numerous cases have reversed convictions or awarded new trials based on faulty arson evidence. The evidence that has been deemed faulty includes evidence that an arson occurred because of poor patterns, charring, holes on the floor that had in the past been used to claim that an accelerant was used. But as we know from subsequent scientific validation, those same observations can be caused by flashover, glowing combustion or radiation. Are you basing that based on your reference of outside material or evidence in the case? I'm basing it on both. And I understand that in the appendix, I put a lot of material from the National Fire Protection Association manual. But I think in this case, because the Illinois Administrative Code, in effect at the time, relies on those materials and because it was heavily testified to in this case by all of the fire evidence. So Investigator Poole, the Deputy Fire Chief Detman and the defense's own expert, it's of the record. And I will also point out there's a second district case, People v. Petrie, which I cited in the brief. It has to do with the shaken baby syndrome. And there's sort of a complicated issue of whether there was a lucid interval to support the state's theory of the case. And in that case, the appellant relied on authority, outside authority, for the purposes of showing that counsel was ineffective. And so it's not as if I'm asking you to make a factual determination on outside sources. It's simply supporting my claim that counsel was ineffective. And certainly, I cited a bunch of cases, albeit from other jurisdictions, that have publicly called out this evidence. As far as raising this issue on appeal, I'm not sure how else I would do it. I don't feel like I, as an advocate for the defendant, I can't wait till post-conviction proceedings to raise it because all of the evidence has come through. And so the real purpose of explaining this kind of complicated issue is to just make sure that it's clear on exactly what the NFPA supports and doesn't support and what the cases that have resulted in overturning convictions in new trials for petitioners and defendants throughout the country have said about this evidence. So I do think it's fair game in its appeal. Indeed, I don't know how I would really raise this issue without it. And of course, like I said, there's a case of People v. Petrie. It is a 2nd District Appellate Court case. But for the purposes of considering whether trial counsel was ineffective, I certainly don't believe it's improper for me to have cited that. So it's my long-winded way of trying to answer the outside source question. You made a statement earlier that the state relied primarily on these expert witnesses who could only testify to the opinion that the fire was not caused by electrical malfunction or some other non-human related cause, that it was set. It was human caused. Really, isn't the bulk of the case the fact that witnesses are always impeachable? And these two may be more impeachable than many others. But isn't the bulk of the case that your client told two people, according to them, I'm going to go burn the building, went into a car with one of the person and he got a ride there with a gas can. At about the time the building then burned and his cell phone is found there and then he later says he had lost his cell phone and then later says, you know, he's nervous and he says, I am smoked. I'm in trouble. Isn't that a lot of evidence even besides what the experts say? I think those witnesses have so many credibility issues. I mean, I'm really struck by the state presenting Jesse Coleman, who purportedly hadn't been on speaking terms with his brother, yet comes at close to midnight, picks him up with a gas can, ostensibly drives him to the scene of what the state alleges is an arson. Drops him off and then testified he had no idea that his brother was going to set the building on fire. I mean, the whole, these witnesses are just, you know, I don't, obviously the record doesn't indicate why Jesse wasn't facing any charges, but the entire scenario that he testified to just has so many serious credibility concerns. I think it calls into question the recitation of what Coleman purportedly said. And that's why, you know, because these witnesses and then, of course, his drug addicted girlfriend, who was admittedly sober for a year by the time of trial, but nonetheless, you know, had been doing drugs all day, had been at the scene of those apartments the day of and had gotten drugs. I mean, the whole, the whole scenario is so, these witnesses are just, they're not credible in the claim. But they're there, and it's for the jury to decide the weight to be given to them. It is, but if you took out, if you took out the law enforcement testimony, if you took out poll indictment, if you took out poll specifically saying this was an intentionally set fire. And if you took out the observations that I, that I counter Detman improperly raised about, you know, being textbook and being, there being poor patterns and not, you know, claiming it's not electrical, but without looking at all of the electrical systems. If you took that out, and you just had these two witnesses, and you had no gas can, and you had no independent corroboration of these statements, I think you'd have a very different case. Even if you had poll testifying it to what I, what I, part of what I argued, which is none of this stuff showed was consistent with what we know are reasonably relied upon standards by fire investigators. The jury heard that opinion. Well, the jury, the jury heard that, but they heard poll give an opinion that the fire was intentionally set. And what I've argued is that it's this, he testified that he was, he would never testify for the defense. He was a law enforcement witness, and it would be inappropriate for him to testify for the defense. So, it's like, I liken it to a police officer that is investigated a case, getting up there and saying the client is guilty. Because if he's not going to follow, if he's going to rely on discredited science, if he has no proof that an accelerant was used because there's no confirmatory testing. What the defense expert said can happen because of the consumption of the accelerant in the fire. And because of washing away any traces as a result of the extinguishing of the fire. Well, I believe that was poll that testified to that. I don't know that Fennel added that. Your client's expert agreed that that can happen, and he has seen it happen. But he didn't agree with the methods used, the failure to validate the conclusions that poll made that it wasn't electrical because the investigation was truncated. It wasn't a complete investigation, and he came up with a hypothesis that couldn't be validly tested. Namely, that the origins were, there was two non-communicating fires, which Fennel disagreed with. And then testified if you don't have the origin correct, you probably don't have the cause correct. And pointed out on the exhibits where the fires could have communicated with each other. And then you have no accelerant. You have no proof of an accelerant. And so to give a scientific conclusion when you don't have a scientifically valid hypothesis that you can test. And then it's coming through from a law enforcement witness is just highly prejudicial. And, you know, I think People v. King, the Illinois Supreme Court case that dealt with the crime analysis talks about that. Here you have, you turn something into a battle of the experts that didn't need to be because counsel should have objected. Counsel had an obligation, even if she put on her own expert. She still had an obligation to understand this evidence and to sufficiently cross examine on this and to make objections. Once once the proverbial cat is out of the bag, it's very hard for her expert to overcome this improper, improper opinion. So, you know, yes, counsel, if I may, even if if we would exclude poll, I guess my question is, what's the reasonable probability? That would undermine the confidence in the outcome that we'd have a different outcome. Well, the prejudice is so great. I mean, he doesn't have to, you know, it doesn't have to be acquitted. But I mean, if you're if you're if you're having a fire investigator come up there and testify, yeah, this was arson. You know, the proving the state's case, basically, if you take take that opinion out, and then you take out some of these, this faulty reliance on poor patterns or whatnot. I think you have a very different case. And you again, I also want to point out this is when you still have. With he called for the ride, he went to the scene, he made these statements, he had a gas can, wouldn't that all still be present? It will be present. But again, it's coming through witnesses that have such I Jesse Coleman in particular is it's a very confusing witness to me just because he, you know, those would still go to the weight of the would still go but it would be it would be without it would be without this improper opinion, it would be without a law enforcement witness testifying that this was arson. You know, it would be without the, you know, you've got somebody and I think the state was right to highlight this in closing argument, you know, like, like in Detman and pull to seasoned mechanics, but they weren't, they, if you took this evidence out, and you only had Carly Fishback and Jesse Coleman testifying and you had no real eyewitness testimony and you had evidence she had been at that apartment and had access to his phone, you know, earlier that day. And then coupled with the fact that, you know, this was a known apartment building to the police and there had been a previous fire and there, you know, there was obvious just issues with this apartment building, I think it would have looked like a very different case for the jury. And of course I'm not just talking about the arson evidence I'm also talking about the historical cell phone data with which you know the jury asked for. If she set the fire and planted his phone or if his brother did, cell phone data would look the same, right? I mean, again, I'm trying to understand what impact the cell phone data has when all it can really tell us is maybe where it started, definitely where it ends up and we know where it ends up. And the question is, did it, did she bring it or did he bring it? Coming from the same place, right? Well, I just don't think it should have been admitted at all. I mean, then if you want to just rely on it. What's the harm? The harm is that the state used it to establish the movement. That's the harm. I mean, he, Wigstand didn't have any... We know the cell phone. We know the phone didn't always reside at the apartments. We know it was found there at the end. We know therefore it had to move there. What is the, what is the cell phone data adding to that? We know it moved to the apartments. But the argument is that it's not showing movement. It's not showing, it's showing the towers it pinged on. We know there's movement. That's what I'm trying to say is, even if you're right, we know there had to be movement because it didn't start out there, but it ended up there. Again, I, you know, the phone, using a police detective who has no training on historical cell site location analysis for the purposes of claiming that the phone moved X, Y, and Z and was dropped off there is prejudicial. You know, you could have Jesse... No, no, it could be improper. Whether it's prejudicial depends on its effect in the case. So what was its effect in the case? It was used to, it was used by the state to try to establish that Stephen went from his house to the scene. Well, that the phone moved. Well, I mean, that it was Stephen that, it was Stephen's phone and that Stephen moved. I know that's a state theory, but the evidence just tells us, according to the state, that the phone moved from Stephen's house to the scene. That's all it tells us. And we know that that had to be true because he had it, and then it was at the scene. Right, but it's, you rely, they're relying on it to show when it got to the scene. I mean, that's... Do you think somebody planted it there ahead of the fire by a day or something? If somebody planted it there, which now we're into the realm of speculation, presumably they did it when they set the fire. So it would show the same thing. It would show it being put there at the time of the fire, unless your theory is that he coincidentally lost it there and sometime later the fire started. Again, you'd have to, you have to make a series of inferences that, you know, Jesse's telling the truth that Coleman got in his car, that a brother he didn't talk to for years called him up... Talking about the cell phone data and what limited impact it could possibly have in this case. That a case where we know where the phone ended up, we know it didn't grow out of the ground there. And the theory for why somebody else would have put it there is that they may be trying to frame your guy, which is, of course, not supported by any evidence. But even if that were the theory, presumably they'd put it there at the time of the fire. So what have we gained? What relevance or what prejudice is there from this information since we know all of that? Well, I just disagree that you could allow a detective to testify to this locate that he came up with this location data. Assume you're correct. Don't you have to show prejudice to make it reversible? Well, if you take, but if you take, if you take his testimony out, you have just the phone being recovered at the scene. And you have the brother that lives three blocks away and you have the girlfriend that has access to it. And you have the girl, that's what you have. I, you know, I don't, I don't, I'm trying to satisfactorily answer that question based on the record I have. But he had the, I mean, it was his phone. The point that she would have been able to get at it means it was at their home. Right? Right. But you don't have a time of it being, you don't, you wouldn't have the time of it being placed right? With all the historical cell phone data saying it ping, ping, pinged. Yeah, somebody, somebody placed it there two days before and then two days later set a fire. I mean, it's just, it just doesn't add anything to the case. It may not accept that they were clearly doing, doing business in terms of purchasing drugs from them. So it wasn't a building they were unfamiliar with. Again, I, the cell phone data, I don't want to get it in. You can finish, go ahead. Yeah, getting in the, it's not, it's not any of this evidence in a vacuum, right? It's, it's the arson evidence, it's Pohl's testimony, it's Detman's testimony. It's this historical, it's, it's a case where how much bad science really is too much. And my argument is in a case where you have a defendant facing three life sentences, this evidence has to be scientifically valid. There has to be a proper foundation for it. And particularly when you weigh this against these two fact witnesses of questionable credibility, it is prejudicial and it is worthy of this court granting a new trial. And for these reasons, I'd ask that the court grant relief. Thank you, Counselor. Mr. Rodriguez. Thank you, Your Honors. Counselor, may it please the court. Defendant did not suffer ineffective assistance of counsel from trial counsel's decision not to challenge the admission of the People's Expert Arson Investigator. In this case, the investigator, Pohl, was properly qualified to testify as an expert under Illinois Rule of Evidence 702. And no legitimate basis exists to challenge the foundation of his testimony. Accordingly, counsel was not deficient and not in declining to raise a meritless challenge and defendant cannot satisfy prejudice under Strickland. As to the issue of deficient performance, counsel did not perform deficiently. Investigator Pohl possessed the sufficient knowledge, training and experience as required by Rule of Evidence 702 to offer an expert testimony. He lays it out abundantly in the record. It's clear that he has extensive training. So any attempt to challenge the foundation for his expert testimony would have been meritless. And as case law makes clear, and this court's well aware, counsel cannot be ineffective for failing to raise a meritless issue. Well, could you could you address not just his qualifications, but whether his methodology was valid? Sure. So one of the issues that defendant brought up a moment ago was this faulty presumption that the arson science is bad. And therefore, all of the testimony or all sort of the basis of investigator Pohl's testimony is is tainted by this sort of specter of propriety, impropriety and faultiness. That's just not supported by the record at all. Investigator Pohl testified he used a scientific method that it conformed with the applicable national fire standards. He outlined in deep detail the basis for his opinion. And defendant's argument on this point really just seeks to cast this sort of conclusory claim that, oh, in other cases, fire science has been found to be faultier. There have been issues which led to defendants receiving post-conviction relief, what have you. But defendant fails to critically connect that to this case. So even under a charitable interpretation, defendant's argument regarding this this claim about faulty fire science, defendant has to connect that to the investigation and the information that investigator Pohl used to make the determination that this fire was incendiary set and intentionally intentionally caused. And defendant utterly fails to make that connection, as I think the colloquy with the court a moment ago shows. At most, defendant is able to cast these sort of aspersions and make references to information outside of the record, which, as this court, you know, as previously stated in Dillard, is improper and impermissible to do. So there is no real basis in the record for the court to make that determination. And at most, the fact that investigator Pohl may not have engaged in any arc mapping or looked at electrical switches and things like that goes towards the weight that would be applied to his opinion and not its admissibility. He absolutely had established admissibility for the foundation of his opinion, and there's really no legitimate challenge otherwise. So in the face of that, counsel, you know, attempted a strategy of claiming that the investigation was hastily formed and based on incomplete information. We know that that strategy was ultimately unsuccessful, but as the appellate court said in Peeble v. Faulkner, an unsuccessful strategy does not equate to deficient performance. Defendant brought up the Petrie case from the 2nd District to support his claim that counsel performed efficiently but not challenging the foundation of investigator Pohl. That case is plainly distinguishable. In that case, the appellate court found counsel was ineffective for failing to cross-examine one of the state's expert witnesses regarding the basis for his opinion that the victim had suffered an injury consistent with shaken baby syndrome and that there would not have been a period of time after suffering that injury where the victim would have appeared fine and wouldn't have exhibited any sort of adverse symptoms or sort of similar issues of concern. In that case, the expert said his opinion on that point was based on information, principles generally accepted in the medical community. However, he did not say what those principles were, and he didn't identify any supporting information or documentation to substantiate that. And then on cross-examination, defense counsel simply asked the state's expert if he agreed with another doctor's testimony that the injury could have occurred several hours later, and the expert said he did. And it was sort of in that failure to really critically cross-examine the expert's foundation for his opinion on this point that the court found defense counsel had performed efficiently by not questioning the state's expert further about this disagreement or any basis for it in the medical literature. Unlike Petrie, Investigator Polk clearly laid out the foundation for his opinion that the fire was intentionally set in incendiary. And defense counsel challenged for the basis of, excuse me, defense counsel did challenge the basis for that opinion, both on cross-examination and through the defense's expert. Therefore, you know, Petrie's distinguishable. But I say that all to say that this court needn't even address the issue of deficient performance because defendant cannot and has not established prejudice under Strickland. Assuming arguendo that the trial court erred in admitting Investigator Polk's testimony, the other evidence and reasonable inferences drawn therefrom inescapably prove defendant guilty. There is evidence of a defendant's motive, his anger over purchasing fake cocaine. There was defendant's statements to his ex-girlfriend and his brother indicating threats to burn down the Western apartments, thus indicating his intent to commit arson. There was evidence of his conduct, obtaining the red gas can from his fish box home, calling his brother for a ride, and traveling to the scene of the arson with the gas can and being seen leaving his brother's vehicle with that evidence in hand. There was also the physical evidence of defendant's phone found at the scene, further narrowing down his movements. There was also evidence related to defendant's post-defense conduct, his request for a false exculpatory statement from his fish box. They were together the entire night when they were not. Defendant's inculpatory statement to his brother following the arson at their mother's home that he was, quote, cooked. All of that information was evidence of consciousness of guilt, excuse me. Thus, defendant cannot establish that the outcome of the trial would have been any different but for the admission of the challenged evidence. And that sort of argument also rings true for defendant's claim about the self-site location data. Even if it was there for that to have been admitted, there was direct evidence from his fish box and from defendant's brother placing defendant directly behind the Western apartments. He was dropped off on Avenue I, which, as the testimony established, was directly behind that building. His phone was found at the scene. So to the extent that there was any error in the admission of the Verizon phone records or the testimony by Detective Wickstand regarding the historical cell site data, that was, you know, at most cumulative to the other evidence that established defendant's location on the night of the crime. You know, so therefore defendant cannot satisfy prejudice under Strickland and related. What about the argument that counsels made that it added to the picture in terms of the movement of the cell phone? And it was used by the state to draw that picture of movement when the underlying data really wouldn't support it. Sure. So I don't agree with that sort of characterization of the evidence judge. At trial, the historical cell site data was used to sort of merely indicate the defendant had been in the Sterling Rock Falls area in the two days leading up to the crime. Defendant's defense in part was based on identity, that no one could put him in the scene of the crime. So at most, the historical cell site data confirmed the defendant wasn't in Chicago or St. Louis. He was in the neighborhood. And more critically, the evidence that put him there was his brother's testimony that he drove him to the building and his cell phone being found at the scene. So even if this information about the historical cell site data placing him near the building, I don't think that's true. The people certainly made the argument in our brief that it placed him near, not that it established definitively he was at the address. Since I'll acknowledge to my friend on the other side's point that historical cell site data doesn't establish a direct location, merely a generalized area. And even if you exclude that testimony of the historical cell site data, we have more direct evidence putting defendant at the scene of the crime. And defendant's sort of response to that is to raise credibility challenge, to ask his court to reconsider issues of the witness's credibility. That was for the province of the jury. Defendant wants his court to also interpret his statements indicative of his intent to burn down the western apartments in a light most favorable to himself, which this court is well aware is not the proper standard of review. If I can circle back a minute, though, and I know your argument is that it helps place him. But really, what the evidence showed is, is once again, where the phone was and what the phone was, was the towers that was pinging from. Correct? Yes, yes, absolutely. So that's why at most that evidence was cumulative, because we have Mr. Coleman's testimony directly putting a defendant in the scene of the crime a short time before the fire started. So, at most, the testimony that it pinged off a cell phone, and he was in a generalized area is cumulative to the more direct testimony that put him right at the scene. If I can turn just for a moment council in a different direction, if you will, to excuse me, article 5. I'm sorry, 584 and I guess I just I want to confirm. Do you agree that the defendants actions were part of a single course of conduct and there was no substantial change in his criminal objective? I don't judge, so I think in regards to section 5-8-4 under sort of the people's argument under the Supreme Court's issues in Terry and the appellate courts discussion in Foster and the Supreme Court's issue in Tucker or holding in Tucker. When you're looking at those cases and you're determining, you know, the consecutive aggregate maximum term allowed for those offenses, you look at the two most serious felony offenses excluding natural life sentences, which in this case would have been defendants to Class X aggravated arson convictions. And so then you multiply what is the maximum sentence there under the analysis established in Tucker and Foster, which is 60 years times 2, which equals 120. Defendant was convicted in sense to 105 years, which is therefore proper and within that applicable range. And one of the issues about. Because I guess I'm going to go back to my question. You indicated that you don't agree with that statement. So do you not agree that it was a single course of conduct? What's the change in the objective? Help break that down for me if you would. So, in regards to that, and sort of broadly to defendants point that I think he tried to make about this being a 1 act 1 crime issue is that residential arson deals with committing arson to the dwelling place. So, there's a, can I interrupt? Yes, this is not a 1 act 1 crime question. Oh, I'm sorry. It is a different standard under the sentencing statute and the requirement is that they were committed as part of a single course of conduct. During which there was no substantial change in the nature of the criminal objective. I see, I apologize. I was a bit confused. Yes, I would not. I would not have any issue with that. This was certainly arson. There was no change the, the fire that caused the damages to the dwelling as well caused the great bodily harm to the victim. But, yeah, those are all the consequences, but the act was kind of 1 act. Correct. Correct. And so, you know, in regards to that sort of analysis, I think Tucker discusses that you would sort of apply or not apply this aggregate consecutive sentence situation when there are separate incidences. And so that's sort of the rationale behind not allowing for an aggregate sentence. But in this case, it all kind of occurred and arose out of the out of the fire. So. So, is there any limit you're saying the, the 1st, degree murder is not. The life sentence does not enter into that math as being the most serious offense. That's correct. Judge. That's what the Supreme Court said in Terry. And that's echoed in the Supreme Court's decision and Tucker, a sentence of natural life is not the most serious offense for purposes of. I mean, in Terry, they were looking at section 5 dash 8 dash 2 of the extended term statute. And there they interpreted as applicable to the next most serious offense for which a defendant could be sentenced to a term of years, which in that case was coincidentally also to class X. Arson convictions, I believe, and Foster applies that sort of that sort of calculation that's echoed in Tucker. So, again, as I argued, it would be the class X offenses. The most extended max would be 60 years times 2, which equals 120 and defendant was sentenced to 105 years. So his sense is proper and not in any way in violation of the aggregate extended terms that consecutive statute. So. Your honors, I didn't want to in the time I have left discuss defendants claim regarding the sensing issue. And in regards to the victim impact statement. Defendant cannot establish prejudice for the admission of the victim impact statement and sentencing, because as our Supreme Court explained to people versus Richardson, that held section 9 of the Victims Bill of Rights, which is based on Article 1, section 8.1 D of our Constitution. It doesn't create a basis for a conviction or granting relief when dealing with the admission of a victim impact statement. Defendant claims that the people read Richardson too broadly. However, our Supreme Court could not have been clearer when it said, quote, based on its plain language, Article 1, section 8.1 D specifically removes victims rights from the spectrum of issues, which a criminal defendant may appeal. That's Richardson at 231 of the opinion. Thus, defendants foreclosed from obtaining appellate relief on the basis of an otherwise legally permissible victim impact statement. Defense counsel was not effective for not challenging the victim impact statement, either at the sentencing hearing or including such a claim in a motion to reconsider sentence as that claim would have been meritless. Moreover, defendant counsel at the trial court improperly relied on the victim impact statement with imposing its sentence. The trial court, as the record shows, relied on defendants escalating criminal history as established in the PSI, evidence of defendants premeditation, which I think we've discussed, and the specific degree of harm suffered by the victims. Therefore, there was no basis to claim that it was necessary to object to the victim impact statement, and defendant cannot establish prejudice under Strickland in regards to this claim. Can you tell me, without regard to prejudice, is there any part of the victim impact statements that you would concede was erroneously received? Erroneously received in what way, Judge? Well, that had the objection been made, they would have been restricted in some way. I don't. I know that defendant takes issue with the sort of presentation of the evidence and referencing, you know, cries of agony. I certainly think that is an issue that perhaps counsel, private counsel who presented it wasn't familiar with how victim impact statements are presented. But this is an issue that's decidedly within the court's purview. Trial courts are presumed to know the law. They're presumed to accept and receive evidence for its permissible reason and to not consider improper inflammatory evidence. Defendant has to establish that the trial court can properly consider that information at sentencing and point to something in the record. Defendant cannot and has not done that. The court, when laying out its reasoning for imposing the sentences it did, laid out everything that it considered, and defendant's, or excuse me, private counsel's victim impact statement was not one of them. So there is no indication in the record that the court improperly considered this at all. And we certainly presume trial courts know the law and to consider evidence for its proper admissible purposes and to exclude consideration of other things absent some affirmative showing which defendant has not satisfied. I'll note finally for separately counsel's claim, or excuse me, defendant's claim that private counsel for Mertz and Mertz didn't qualify as a victim representative under the act. I think that's just painfully inconsistent and ignores, you know, the plain language of the act which defines a victim's attorney under 725 ILCS 120-3G as an attorney retained to represent the victim and assert their constitutional and statutory rights. The select victims who were hired by private counsel chose to retain him so that he could represent a consolidated victim impact statement addressing all of their rights and having the court consider that information in the totality of the information it considered at sentencing. That's absolutely proper defendant's argument that somehow counsel didn't fall within the definition, I think is meriless. So, therefore, your honors, for these reasons, as well as those that people argued in our brief, we ask you affirm defendants conviction and sentence if there are no other questions from the court. All right, thank you, counsel. Ms. Kinastro. Thank you, just briefly, your honor. One of the points that opposing counsel made was that this, the faulty evidence that I identified with respect to the arson was not critically connected to Paul's opinion and I just wanted to draw the court's attention to one of the quotes from Paul's which I cited in the brief. He says he started with an open mind and began to eliminate certain things in order to quote unquote determine what a reasonable person would infer when you were given this particular set of circumstances and fire patterns and damage. And then after ruling out spontaneous combustion mechanical or electrical issues, he quote, tried to come up with something and at the end of this I came up with the only solution that I could, the only logical reason for this fire because I couldn't find any other reason for there to be a fire. Well, that's, that's not, that's, that's the authorities that I cited. And, you know, the standards that are applicable to fire investigation. It's not to just say. Are you talking about the NFPA 921? Well, I'm, yeah, I'm talking about using this, you know. Right, but didn't didn't your clients expert say that that is not binding or have the force of law. Well, it's, it's not just the NFPA it's whether it's the type of evidence reasonably relied upon in the scientific community, they're presenting poll as an expert, and it's not deciding that you're using a process of elimination without having a scientifically valid testable hypothesis is not is not a foundation for an opinion that this fire was incendiary. And my point is, that's, that's how I connected it. It wasn't enough for counsel just to present an expert on this. She, she had to go a few steps further and and say, there's just no foundation for polls conclusion that this is arson because the stuff he's relying upon is not reasonably relied upon anymore. Specifically, specifically, what is is demonstrated to be not relied upon in courts as far as evidence of an incendiary origin, the burn pattern, the burn patterns, the, the fact that the fire burns hotter if it's arson, all of the charring evidence claims that it was not electrical without actually looking at all of the electrical systems in the building, the failure to rule out methane, which not only can be part of the sewer, but can also occur naturally in the ground and can build up in the structure. There is, there's just, you know, you can go down the list. I think I outlined it at several points in the brief, but it's just not, it's, it would have been a different, you know, the conclusion only only valid conclusion here was undetermined. It wasn't based on everything poll testified to. It wasn't, this is a, this fire was intentionally set. He just didn't have any, any proof of that. And, you know, the last he can testify to what he observed, but you can't draw conclusions on it based on things that no longer are scientifically valid. And that was the same problem with Detman. You really have to law enforcement witnesses. If I may interrupt you, though, if we take even for the purposes of your statements right now, if we assume, maybe that relates the burn pattern and that it burns hotter if it's arson, I guess, explain to me how the claim with regards to the electrical though has been debunked. I mean, that doesn't seem so much of the theory as you're suggesting there are other things you feel he should have looked at. Well, I think you can't say it's not electrical by looking at that one. My understanding based on the testimony was he looked at that one outlet that shows up in the exhibits and then the boxes, but that doesn't, you know, there's electrical outlets all the way through that building. And you had a unit in there that had started on fire, apparently from a stove, although I don't think they ever, ever proved that. So it's not like this was a building, a pristine building without problems. It had problems. It had known issues. There was a prior fire. So, but the point is, is that it is critic, I did critically connect it. Coleman did critically connect the faulty reliance on this bad science to the conclusion that poll draw and argued that it was prejudicial. And I also just briefly with respect to the lack of prejudice, these, the law enforcement testimony purported to corroborate Jesse Coleman. So it, there wasn't anything to corroborate that Coleman actually made those statements. There wasn't anything independent. You really did have to rely on credibility. And for all the reasons I argued in the brief, these were incredible witnesses and it was highly prejudicial in this case to admit this faulty science. All right, thank you to both counsel for your arguments. It's been very helpful. We will take this matter under advisement and stand in recess.